FIRST NATIONAL BANK OF APPLETON, Guardian of Leona Nennig, Incompetent, Plaintiff-Appellant, v. Norman J. NENNIG, Defendant-Respondent.

Supreme Court

*No. 77-233. Submitted on briefs November 7, 1979.—Decided December 4, 1979.*
(Also reported in 285 N.W.2d 614.)

520

For the appellant the cause was submitted on the briefs of *Bonk, Lutz & Hertel* of Chilton.

For the respondent the cause was submitted on the brief of *Kaftan, Kaftan, Kaftan, Kuehne, Van Egeren & Ostrow, S.C.,* of Green Bay.

CONNOR T. HANSEN, J.  On March 20, 1975, Leona Nennig sold her 80 acre farm to her second cousin, Norman J. Nennig, defendant-respondent, on a land contract. The farm was sold for $32,000, and the land contract provided for principal payments over 20 years at

$1600 per year, plus interest on the declining balance at five and one-half percent per year, and contained an acceleration clause which could be invoked at the instance of the seller.

The First National Bank of Appleton was appointed temporary guardian of Leona Nennig on April 2, 1975, on petition of her brother, Randolph, commenced this action on April 4, 1975, and was appointed guardian on July 28, 1975. The complaint alleges that Leona Nennig was without sufficient mental capacity to enter into the contract, that the contract was the product of undue influence exerted on her by the defendant, and that the defendant violated a confidential relationship existing between the parties in order to secure an unjust pecuniary benefit for himself, so as to require equity to impose a constructive trust on the property for her benefit.

Leona testified that she had three brothers, Harold, Victor and Randolph. She lived and worked on this farm from 1943 until 1975. During this period the farm was owned by her brother Arno and her father, both of whom predeceased her. She had taken care of her mother who died in 1965. Also in the mid-sixties she purchased the farm and endeavored to operate it. She found she was unable to operate it alone, so she sold the cows and equipment at auction and then rented the land on shares.

She lived on the farm alone and in 1968, when the share renters quit, she rented the farm to the defendant, Norman, whom she had known all her life. She testified that Norman had come to her place because he was worried about what she was going to do with the farm. They finally agreed that Norman would rent the 80 acres for $1600 per year and the rent was later increased by $300 per year. In 1970, Norman began renting the barn for $200 per year.

She further tetsified that from 1973 on, Norman asked her to sell the farm to him many times. He said he would

give her a good price and told her not to sell the farm to anyone else or talk to anyone about the farm. He told her that her brothers were after the farm and they were going to put her away, but if she sold the farm to him, he would help her and they could not do anything. He would also let her live on the farm. When he came to visit her, he would ask if she had seen anybody and what they talked about. He said these things regularly during the last two years before she sold the farm. She was very upset and nervous by what he said and so could not sleep. And because he told her that her brothers would not help her, she decided to make a will leaving everything to Norman's children.

Norman supplied her with meat and vegetables. He brought these to her so that he would not have to pay higher rent. He also told her that if she would sell the farm to him, he would give her meat and vegetables for as long as she lived.

She testified she had been an epileptic for 30 years and had seizures. She had been in a hospital three or four times. She lost her driver's license in 1970. This affected her ability to get around, and she did not see very many people afterwards, including her three brothers. Previously, she had owned a car, did her own shopping and visited friends. After she lost her license, Leona did get into town a few times to play cards with the senior citizens. Usually, Norman and his family got groceries for her, ran errands and took her to church a few times. His children also cut the lawn and shoveled snow. Randy would also take her a few places.

She went to the hospital in March, 1975, and was there one week. Dr. Heinen, her attending physician, advised her to move off the farm and into the city so that she could be with other people. The day after she came home from the hospital, she told Norman that she thought she would sell the farm. She did not care about staying on

the farm anymore; she thought that if she stayed, her condition would get worse. Norman told her that he would take her to a lawyer who would take care of everything. They discussed the price and Norman told her he would pay her $400 per acre because he could not afford to pay any more than that, and that was all the farm was worth. Leona did not suggest a price, but thought that it was a little too low. She did not know what land was worth, and had never discussed the value of her land with anyone, but she thought Norman was familiar with the price of land. They talked about it for quite awhile, but did not reach an agreement right away. Norman told her that she would get $32,000 plus interest, and he suggested an interest rate of 5½ percent. She did not feel that this was a fair amount of interest, but she later agreed to it because Norman kept telling her what he had done for her and what her brothers would have done if he did not help her out. Norman figured out how much money she would be getting in the future, including social security payments, and told her that would be enough. He also brought up the fact that she was going to leave her property to his daughters. Their conversation lasted all morning and they never came to a conclusion as to whether she was going to sell or not. It was not until she realized that she was going to go back to the hospital and had to get off the farm that she decided to sign the contract.

Later that day or the next day, Norman took her to a lawyer, Wilford Elliott. Norman had talked to Elliott before they arrived, but this was the first time Leona had seen Elliott. Norman had told her that Elliott was a good lawyer. She signed the contract which was prepared in advance, because of all the things that Norman had said to her over the years, such as the fact that she would not have anything to worry about in the future if she sold the farm to him. She also testified Norman

told her not to tell people the price for which she sold the farm.

The next day she became unhappy about the contract, and started to do some figuring. She went over what it cost her to live, including expenses for food, clothing and doctor bills, and figured that in a few years she would run out of money. She realized that she would be paid $1600 on the first of April every year, and at the time she signed the contract she thought that she could live on $1600. But after figuring it out, she realized $1600 was too low so she told this to Norman. He told her it cost too much for him to run the farm, and that since the papers were signed, there was nothing her brothers could do.

Before Norman talked to her about selling the farm, Leona thought of selling it to Jack Down, a neighbor. He had talked to her several times and said that anytime she wanted to sell the farm, she should let him know. After the contract for the sale of the farm to Norman had been signed, Down offered her $65,000 for the farm.

Shortly after the contract was signed, she moved into an apartment in town that Norman had gotten for her. The reason she moved is that she thought she had better follow Dr. Heinen's advice.

On cross-examination Leona testified that she sold the farm and moved to town because Dr. Heinen had recommended that she no longer live alone on the farm, but live in town so that she could associate with people. She wanted to leave; no one pushed her off the farm. About the same time that she signed the land contract, she arranged to rent an apartment. She paid the rent from her own checking account, and understood that it was not furnished and she had to pay for utilities. After the contract was signed, she did not move into the apartment right away, but moved into Randy's house for a couple of months. She moved out of his house because he and a

friend drank too much, and moved into the apartment in May.

Leona testified she saw Randy the day after she executed the contract and told him she had sold the farm to Norman. Randy got excited, bawled her out and explained to her the mistake she had made. He told her that she should have the abstract; otherwise, she probably would not get her money. She called Norman and told him she was unhappy because he kept the abstract, and she wanted it so that she could be sure he would pay her. Norman later did give the abstract to her.

Leona testified she was in court during the guardianship proceeding, and was upset because she knew she could take care of her own affairs. She had over $14,000 in a savings account and went to the bank herself every six months to collect the interest and put it into her checking account. It was not until a guardian was appointed that she started to worry about whether she was going to be put away.

She also testified that she and Norman got along well, he was willing to do anything for her and was never mean to her, and she was fond of his children. She knew she sold the farm to Norman for less than market value, and that she could have gotten more money from someone else. But she sold it for less because she had a good, friendly relationship with Norman over a period of many years. She was satisfied with the things Norman had done for her, and her brothers had not done anything. She knew that Jack Down would have paid more, but she sold it to Norman because of the things he had done for her. She thought it was worth $32,000 to let the farm go, because she wanted to get off the farm anyway. Another reason she agreed to the price was the fact that Norman agreed to supply her with food, meat and vegetables for as long as she lived. And she figured out how much this agreement was worth. This agreement was not

put into the contract, but was reduced to writing on April 1, 1975.

Norman Nennig testified that he started renting the farm in 1968 for $1600 per year, and he did not think that this was inadequate because other farms in Calumet county were renting for $20 an acre. Leona never asked him to raise the rent until the five-year lease was up. Norman started giving food to Leona right from the beginning. He gave it to her because she was a friend and it did not have anything to do with the amount of the rent. He contacted Leona concerning the renting of her farm in January, 1968, when he became aware that the share renters were no longer going to be working the farm. Leona told him that she thought her brothers were trying to take advantage of her. They discussed her brothers often and she wanted to know why her brothers wanted to get her off the farm. He told her that it was her affair and he did not want anything to do with it. Norman stated that he never agreed with her that her brothers were trying to take advantage of her, nor did he tell her to take his advice so that her brothers could not take advantage of her.

Norman testified that he saw Leona seldom during the first few years he rented the farm, but in 1970, when he brought in hogs, he saw her regularly. From 1972 on, Leona did not have a driver's license and could not go anywhere by herself and his daughter took her to town quite often and Randy also drove her.

Norman testified that he never advised Leona about business or personal affairs, but he was the only one she had to depend on, so he helped her with small decisions, not big ones. He did not encourage her to sell the farm and did not talk to her about it for several years before March, 1975. She did discuss other decisions with him and relied on his advice to a degree, but the final decision was up to her. He was very close to her

as a friend, probably the closest person to her in the few years before she sold the farm.

Norman testified that he was not constantly after Leona to sell the farm to him. He was not always interested in whoever came to see her and he did not inquire about who they were or what they wanted. He did not tell her not to talk to anyone about the farm, and he did not exert any pressure on her to force her to sell the farm.

According to his testimony, the matter of selling the farm first came up on the morning of March 18th when she told him that, on the advice of Dr. Heinen, she had decided to sell the farm and move into town. She asked him to go to town that morning and check on an apartment, which he did, and when he returned he told her that he had found an apartment for $65.00 a month, and she thought that would be nice. When he got back to her place after looking for the apartment she had several figures laying out on the table. She had the price of $32,000 at $400 per acre written on a piece of paper. She also had the interest rate of 5½ percent and she had the yearly principal set out and what the interest would start at. She stated she had outside income, but he did not know the amount, and they discussed social security, but he could not advise her as to that. The terms of the contract were arrived at from the figures she had written down. There was no argument about the terms and Norman did not put any pressure on her.

Norman told Leona that she could pick her own lawyer, but she said she was mad at her lawyer, Robert Lutz. He suggested Wilford Elliott and told her that he did not know Elliott, but understood he was a competent lawyer. Leona asked to see Elliott, so Norman made an appointment.

On March 19th, Leona gave Norman the abstract for the legal description and he took it to Elliott's office on

the morning of the 20th. He and Elliott discussed some of the terms that Norman and Leona had agreed on. Norman then went back home, picked up Leona and they arrived at Elliott's office around 10 a.m. They discussed the terms and conditions of the contract. Elliott pointed out to Leona that the price was somewhat under market value. She indicated she realized that and knew she could sell it for more, but it was her wish to sell at that price. Elliott also pointed out that the 5½ percent interest rate was too low, but she stated it did not make too much difference. The food arrangement was discussed and she and Norman agreed that they would either have an oral agreement or some written contract drawn up later. Leona said she wanted a clause in the contract whereby she could demand more money to pay emergency bills without having to borrow the money outright. When they reviewed the contract, language to this effect was missing so Leona brought it to Elliott's attention, at which point he called his secretary back and dictated the acceleration clause. The food contract was drawn up on March 24, 1975.

Norman testified that the farm was assessed for tax purposes in 1975 at a value of $51,000, and Leona was aware of this.

There was testimony by Donald H. Steege, a real estate broker and farmer, that the Leona Nennig farm was worth $39,750 on October 15, 1975, and testimony by Victor Voight, an auctioneer and appraiser, that it was worth $41,000 on November 4, 1975. R. A. Thiel, an auctioneer and real estate broker, testified that in March, 1975, he appraised the farm at $65,000.

Additional facts will be set forth in our consideration of the issues, which are:

1. Is the trial court's finding that Leona Nennig was mentally competent at the time she entered into the land contract against the great weight and clear preponderance of the evidence?

2. Is the trial court's finding that the land contract was not the product of undue influence exerted by Norman Nennig against the great weight and clear preponderance of the evidence?

3. Did the trial court err in failing to impose a constructive trust?

4. Did the trial court err in failing to rescind the land contract on the ground of mutual mistake?

The trial in this case was to the court and after making extensive findings of fact the trial court entered judgment dismissing the complaint.

The standard for review of findings made by the trial court was stated in *Cogswell v. Robertshaw Controls Co.,* 87 Wis.2d 243, 249, 250, 274 N.W.2d 647 (1979):

"Findings of fact by the trial court will not be upset on appeal unless they are against the great weight and clear preponderance of the evidence. The evidence supporting the findings of the trial court need not in itself constitute the great weight or clear preponderance of the evidence; nor is reversal required if there is evidence to support a contrary finding. Rather, to command a reversal, such evidence in support of a contrary finding must itself constitute the great weight and clear preponderance of the evidence. *In re Estate of Jones,* 74 Wis.2d 607, 611, 247 N.W.2d 168 (1976). In addition, when the trial judge acts as the finder of fact, and where there is conflicting testimony, the trial judge is the ultimate arbiter of the credibility of the witnesses. *Gehr v. Sheboygan,* 81 Wis.2d 117, 122, 260 N.W.2d 30 (1977). When more than one reasonable inference can be drawn from the credible evidence, the reviewing court must accept the inference drawn by the trier of fact. *Id.*"

*MENTAL COMPETENCY.*

The law presumes competency rather than incompetency; it will presume that every person is fully com-

petent until satisfactory proof to the contrary is presented. *Nyka v. State,* 268 Wis. 644, 646, 68 N.W.2d 458 (1954).

The test of competency is, did the person involved have sufficient mental ability to know what he was doing and the nature of the act done. *Estate of Schalla,* 2 Wis.2d 38, 43, 44, 86 N.W.2d 5 (1957); *Plainse v. Engle,* 262 Wis. 506, 511, 56 N.W.2d 89, 57 N.W.2d 586 (1952); *Boorman v. Northwestern Mut. Relief Asso.,* 90 Wis. 144, 148, 62 N.W. 924 (1895).

The trial court found that on March 20, 1975, Leona Nennig fully comprehended the essential details of the transaction, understood the nature and terms of the sale and freely assented thereto. This finding of mental competency is amply supported by the evidence.

Leona Nennig testified at the trial and her testimony indicates that she understood the nature of the proceedings, she recalled the history of the farm being in her family, how it had been first owned by her father, sold to her brother, Arno, and subsequently purchased by her from her father in 1963, following Arno's death. She testified as to subsequent terms of rental arrangements made with the defendant beginning in 1968. The character of her testimony was consistent with a person having the capacity to remember, understand and appreciate what has happened and what is happening as it pertains to her.

Wilford W. Elliott, the lawyer who handled the land contract transaction, testified that his first professional contact with the Nennigs occurred on March 19, 1975, when he received a telephone call from Norman Nennig for an appointment concerning the land contract, and one was arranged for 10 a.m. on the following day. The following day at 9 a.m. the defendant came to Elliott's

office with a description of the premises, the names of the parties, the selling price, payment and interest rate. After the defendant left, Elliott had his secretary type in the names of the parties, with the other terms left blank. When the parties arrived for the 10 a.m. appointment, Elliott testified that he first asked Leona if she would like to discuss the transaction privately; she declined indicating that it was all right for Norman to be present. He, however, asked her what terms had been agreed upon, and she gave the same terms as had been given to him by Norman earlier that day. He then dictated those terms to his secretary and afterwards, Leona noticed that the acceleration clause for additional payments of the purchase price in the case of emergency or special need on her part was not included. Elliott then dictated an additional term which was incorporated in the payment provision.

Elliott testified that while the contract was being typed he told Leona that she could probably get a better price for the land. She replied that she realized this but Norman had worked on the farm for a long time, had done a lot for the farm and that she was leaving her money to his children anyway. She figured that with her savings and income from the land contract, she would be adequately provided for. The arrangement regarding the provision by Norman of meat and vegetables from the farm as needed by her was discussed, but at Elliott's suggestion it was not incorporated into the provisions of the land contract. He recommended that the parties take care of this between themselves. Leona also discussed her income requirements in view of her impending move to an apartment in Chilton and the interest rate of 5½ percent was discussed. Elliott testified that he explained to Leona that the prevailing interest rates were higher, but she said she had money in the bank drawing 5½ percent interest and could see no reason why Norman

should pay more than that. On the basis of his personal observations and conversation with Leona on March 20, 1975, Elliott was of the opinion that Leona fully understood the terms, provisions and implications of the land contract and she appeared normal in her behavior and comprehension.

Her apparent mental capacity was consistent with the medical opinions of all the qualified experts that while Leona had been subject to epilepsy for 30 years, and is a chronic paranoid schizophrenic, these conditions did not render her mentally incompetent at all times. The experts testified that persons suffering from schizophrenia have intervals during which they are capable of handling their own business affairs. In this regard, the evidence showed that Leona kept her own business records, handled the rental of her farm, sold personal property and maintained her own bank accounts until April, 1975, when her brother began proceedings for the appointment of a temporary guardian.

Plaintiff's medical experts, Dr. John R. Marshall and Dr. Robert Heinen, both expressed the general opinion on direct examination that Leona was not mentally competent on March 20, 1975, in respect to entering into an agreement for the sale of her land. However, Dr. Marshall's first contact with her was in March, 1972, in a Madison hospital where she had been sent by her physician because of an orthopedic problem. Dr. Marshall found her to be suffering from epilepsy and from borderline schizophrenia which he thought had pre-existed for several years. He did not see her again until April, 1976, over a year after the execution of the land contract. He then diagnosed her condition as chronic paranoid schizophrenia. Because of her then condition he concluded that Leona, on March 20, 1975, would not have been able to make a reasonable judgment on the sale of

her farm and could have been easily influenced by one close to her such as the defendant. However, on cross-examination, Dr. Marshall conceded that periods of lucidity were characteristic of a person in Leona's condition, and therefore, it would be difficult to make a definite judgment as to her capacity to understand what she was doing on March 20, 1975; that he would have to be actually present at that time to give a definite medical opinion.

Dr. Heinen first treated Leona for a physical problem in November, 1974, he noted her history of epilepsy, and it was his diagnosis that she had suffered from this condition for some time. In March, 1975, she was again hospitalized and Dr. Heinen diagnosed her condition as acute anxiety, agitated depression and possible psychosis. In view of this, he advised Leona that she should either get someone to live with her on the farm or move into the city where she would have more personal contacts. It was Dr. Heinen's opinion that Leona was not mentally competent on March 20, 1975, in that she was not then in a mental condition to understand the force and effect of the land contract she executed. However, he conceded on cross-examination that Leona had lucid intervals during the times he observed her; that she could have understood that she was selling the farm, and, in fact, talked about it before she left the hospital. Just as in the case of Dr. Marshall's testimony, Dr. Heinen conceded that he would actually have to have been present on March 20th in order to state with any degree of certainty whether Leona was able to understand the contract.

The record also reflects that on April 7, 1976, after the temporary guardian had been appointed, a trust officer from the bank, a lawyer from Appleton, Leona and her brother, Randolph, went to Dr. Heinen's office for the purpose of having him serve as a witness to a

new will she was about to execute. He knew that he was asked to serve as a witness to this will so that he could testify and at the instant trial he testified that at the time she signed the will she was mentally able to understand what she was doing.

The testimony of Dr. Thomas Malueg, defendant's medical expert, did not differ substantially as to diagnosis of Leona's mental disorders. It was his opinion that a person suffering from chronic paranoid schizophrenia may remain competent to manage her personal affairs, and that it is impossible to predict with any degree of medical probability that such a person would or would not be competent to do so at any particular time. Based on his findings and on the testimony of lawyer Wilford Elliott concerning the events of March 20, 1975, culminating in the execution of the land contract, it was Dr. Malueg's opinion that Leona was mentally competent to enter into the contract to sell her farm at that time. On cross-examination he conceded that he would have to be present at the time under consideration to give his own independent opinion of her competency in that regard.

Leona's friends and acquaintances testified that they could see nothing wrong with her, that she was capable of playing good cards and conducted business transactions involving the sale of personal property in a manner indicating that she knew what she was doing. Their testimony further bears out the fact that Leona had frequent periods of lucidity before and after execution of the agreement.

We conclude there is credible evidence to support the findings of the trial judge on this issue. There is testimony that Leona wanted to sell the farm realizing, partially on the advice of Dr. Heinen, that she could no longer live alone at the farmhouse. She wanted to give Norman the first chance to buy the farm because he had worked it so long, had done her personal favors, and that

at the time, his children were the principal beneficiaries under her will. The evidence also indicates that the price and interest rates, while low, were of her own choosing because she felt that Norman could afford to purchase the farm at those terms and that price, and that the acceleration clause and her other resources would enable her to get along, particularly in view of the agreement for Norman to furnish her with meat and vegetables for the rest of her life.

Considering the medical testimony, the long relationship between Leona and the defendant and his children, Leona's actions leading up to the agreement, immediately preceding the execution of the land contract and at the time of the signing in Elliott's office, it cannot be said that the trial court's finding that Leona Nennig was of sufficient mental capacity to enter into the land contract on March 20, 1975, was against the great weight and clear preponderance of the evidence.

## UNDUE INFLUENCE.

Undue influence must be proved by clear, satisfactory and convincing evidence. *In Matter of Estate of Sensenbrenner,* 89 Wis.2d 677, 685, 278 N.W.2d 887 (1979); *In re Estate of Kamesar,* 81 Wis.2d 151, 158, 259 N.W.2d 733 (1977); *Estate of Hamm,* 67 Wis.2d 279, 282, 227 N.W.2d 34 (1975). On appeal, this court will examine the record, not for evidence to support a finding which the trial court did not make, but for facts to support the finding the trial court did make. *In re Estate of Fechter,* 88 Wis.2d 199, 214, 277 N.W.2d 143 (1979); *In re Estate of Glass,* 85 Wis.2d 126, 134, 270 N.W.2d 386 (1978); *In re Estate of Evans,* 83 Wis.2d 259, 271, 265 N.W.2d 529 (1978); *Estate of Hamm, supra,* at 282.

Undue influence in the execution of an inter vivos conveyance is proved in the same way that undue influence is proved in the execution of a will. *In re Estate of Taylor,* 81 Wis.2d 687, 699, 260 N.W.2d 803 (1978); *Estate of Larsen,* 7 Wis.2d 263, 96 N.W.2d 489 (1959). There are two traditional methods of proving undue influence:

"One is by proving the elements that this court has said show undue influence. Those are: (1) susceptibility to undue influence, (2) opportunity to influence, (3) disposition to influence, and (4) coveted result. *In Matter of Estate of Becker,* 76 Wis.2d 336, 347, 251 N.W.2d 431 (1977); *Estate of Hamm,* 67 Wis.2d 279, 283, 227 N.W.2d 34 (1975); *Estate of Von Ruden,* 55 Wis.2d 365, 373, 198 N.W.2d 583 (1972). . . .

"The second method of challenge is to prove the existence of (1) a confidential relationship between the testator and the favored beneficiary and (2) suspicious circumstances surrounding the making of the will. *Will of Faulks,* 246 Wis. 319, 360, 17 N.W.2d 423 (1945); *Will of Cooper,* 28 Wis.2d 391, 395, 137 N.W.2d 93 (1965); *Estate of Hamm,* 67 Wis.2d at 294." *In re Estate of Kamesar, supra,* at 158, 159.

On appeal, the argument is confined to the four-element test. However, the trial court did not use either test in order to find that the defendant did not exercise undue influence over Leona Nennig.

Although the burden is on the objector to prove by clear, satisfactory and convincing evidence that the will or other conveyance was the result of undue influence, when three of the four elements have been established by the required quantum of proof, only slight evidence of the fourth is required. *In re Estate of Evans, supra,* at 281; *In re Estate of Taylor, supra,* at 699; *In Matter of Estate of Becker,* 76 Wis.2d 336, 347, 348, 251 N.W.2d 431 (1977).

The evidence would support a finding that Leona was susceptible of being influenced by the defendant. It was undisputed that Leona is a psychotic and schizophrenic individual. Dr. Heinen's diagnosis indicated that she could have been susceptible to the influence of a person close to her, and would accept suggestions from someone she trusted. Leona trusted Norman and Norman himself testified that Leona accepted his advice on occasions and he was the closest person to her during the seven years preceding the execution of the land contract. Furthermore, Dr. Marshall testified that Leona was susceptible to Norman's influence during this period of time.

Norman had ample opportunity to exert undue influence on Leona. Since 1968, and especially in the last few years before March 20, 1975, Norman saw Leona on a regular basis, at least several times a week, and he saw her more than any other person did.

Disposition to influence implies a willingness to do something wrong or unfair. *In re Estate of Fechter, supra,* at 217; *In re Estate of Kamesar, supra,* at 161; *In Matter of Estate of Becker, supra,* at 350; *Estate of Hamm, supra,* at 289, 290.

Leona testified to the effect that the defendant persisted over a long period of time in trying to get her to sell the farm to him and told her that her brother Randy would not be of any help to her and was trying to put her away. The testimony of Norman, which is equally credible, is directly contrary to that of Leona on this point.

However, assuming that Norman had indicated over a period of time his desire to purchase the farm from Leona, there is no evidence that he at any time exerted any direct pressure on her to sell at any particular time. In his testimony, Norman denied that he tried to get Leona to sell the farm to him and stated that he was con-

tent with the rental arrangement. It would appear that the only serious negotiations for defendant's purchase took place when Leona told him about Dr. Heinen's recommendation and her decision to move to the city. She testified that he offered her $28,000 for the farm, while he testified that she had already prepared a written memorandum of terms, including a purchase price of $32,000 and an interest rate of 5½ percent. At any rate, it is undisputed that the purchase price of $32,000 and the interest rate were mutually agreed to before defendant suggested that they contact a lawyer to draft the documents. Elliott testified that he had no prior contact with either party, and Norman testified they went to Elliott because, at the time, Leona was dissatisfied with the services of her own lawyer.

There is no evidence that Norman demonstrated a willingness to do anything wrong or unfair to secure the farm for an inadequate price.

The element of coveted results goes to the naturalness or expectedness of the conveyance. *In re Estate of Taylor, supra,* at 700; *Estate of Hamm, supra,* at 291.

The testimony reflects that Leona's relationship with the defendant and his children over a period of years had been close and cordial. The testimony also leads to the reasonable conclusion that Loena wanted to give the defendant the first chance to buy the farm because he had worked it so long, improved it, had done her personal favors and at the time his children were the principal beneficiaries under her will. The evidence further indicates that the price and interest rate were low, but they were of Leona's own choosing because she felt that the defendant could afford to purchase the farm at those terms and that price. She also felt that the acceleration clause, her other resources and the agreement for the

defendant to furnish her meat and vegetables would enable her to get along. Thus, it was not unnatural for Leona to sell the farm to Norman for less than fair market value. Therefore, the trial court's finding that Leona was not unduly influenced by Norman was not against the great weight and clear preponderance of the evidence.

## CONSTRUCTIVE TRUST.

Appellant alleges that a constructive trust should have been imposed on the property in Leona's behalf in order to prevent the unjust enrichment of the defendant at her expense.

A constructive trust is imposed by a court of equity to prevent unjust enrichment which arises when one party receives a benefit the retention of which would be unjust as against the other party. *Prince v. Bryant,* 87 Wis.2d 662, 667, 275 N.W.2d 676 (1979); *Richards v. Richards,* 58 Wis.2d 290, 296, 297, 206 N.W.2d 134 (1973). However, this court has consistently said that unjust enrichment in itself is not sufficient to invoke the doctrine of constructive trust, but some additional factor must be shown, such as actual or constructive fraud, duress, abuse of confidential relationship, mistake, commission of a wrong or any form of unconscionable conduct. *Prince v. Bryant, supra,* at 667; *Gorski v. Gorski,* 82 Wis.2d 248, 255, 262 N.W.2d 120 (1978); *Meyer v. Ludwig,* 65 Wis.2d 280, 286, 222 N.W.2d 679 (1974); *Estate of Schmalz,* 58 Wis.2d 220, 227, 206 N.W.2d 141 (1973); *Estate of Massouras,* 16 Wis.2d 304, 312, 114 N.W.2d 449 (1962).

Therefore, the imposition of a constructive trust requires that the record in this case establish (1) unjust

enrichment on the part of the defendant, and (2) abuse of a confidential relationship or some other form of unconscionable conduct. *Gorski v. Gorski, supra,* at 255; *Meyer v. Ludwig, supra,* at 287.

The trial court found that no confidential relationship existed:

". . . the Court is unable to determine from the evidence that such a relationship existed at any time up to and including May 20, 1975 between these parties. The fact that the two were on friendly terms, were related as second cousins, had a continuing relationship of lessee and lessor of the farmland and at times discussed business transactions does not of itself lead to a permissible influence [sic] that a confidential relationship existed between them, particularly in the absence of proof that Miss Nennig relied on the defendant to act in her behalf in the management of her affairs. On the contrary, all the testimony indicates that Miss Nennig handled all of her own business from selling personal property, investment in bank accounts and in keeping necessary records."

This finding is not against the great weight and clear preponderance of the evidence.

## MUTUAL MISTAKE.

On this appeal, for the first time, appellant argues that Leona and Norman acted under a mistake when they entered into the land contract because they both assumed that Leona would receive social security benefits in the future, while other evidence indicated that Leona did not qualify for social security. Appellant argues that the contract should have been rescinded on the ground of mutual mistake, and the trial court erred in not doing so. There is, however, nothing to show that a claim of mutual mistake was ever made prior to the filing of appellant's brief on appeal. The record is to

the contrary, for nowhere in the pleadings, evidence, motions or otherwise was such a claim made. The allegation of mutual mistake made for the first time on this appeal is beyond the purview of the appeal before the court. This court will not consider new grounds for relief which are not brought to the attention of the trial court. *Ins. Co. of North America v. Univ. Mtg. Corp.*, 82 Wis.2d 170, 175, 262 N.W.2d 92 (1978); *Hein v. Torgeson*, 58 Wis.2d 9, 14, 205 N.W.2d 408 (1973); *Joplin v. John Hancock Mut. Life Ins. Co.*, 55 Wis.2d 650, 655, 200 N.W.2d 607 (1972).

The appellant raises several other issues which we consider to be but tangential to the principal issues of the case. We do not believe any useful purpose will be served by a detailed consideration of them in this opinion.

We, therefore, conclude the judgment of the trial court should be affirmed.

*By the Court.*—Judgment affirmed.