FIDELITY & DEPOSIT COMPANY OF MARYLAND, a foreign corporation, and First Federal Savings & Loan Association of Wisconsin, a Wisconsin corporation, Plaintiffs-Appellants,

v.

FIRST NATIONAL BANK OF KENOSHA, a federally chartered banking corporation, Defendant-Respondent.

Court of Appeals

*No. 79-1720. Submitted on briefs May 22, 1980.—*
*Decided August 13, 1980.*
(Also reported in 297 N.W.2d 46.)

For the plaintiffs-appellants there was a brief by *de Vries, Vlasak & Schallert, S.C.,* of Milwaukee, and *Professor Ralph C. Anzivino,* of counsel.

For the defendant-respondent there was a brief by *Heide, Hartley, Thom, Wilk & Guttormsen,* of Kenosha.

Before Voss, P.J., Brown, J., and Moser, J.

MOSER, J.   This is an appeal from a judgment dismissing the complaint of First Federal Savings & Loan Association (First Fed) and Fidelity & Deposit Company of Maryland (Fidelity) against First National Bank of Kenosha (First National).  First Fed and Fidelity sued First National for accepting home improvement loan

checks containing forged endorsements. After trial to the court, the action was dismissed based on First Fed's negligence in contributing to the forged endorsements.[1] Judgment in favor of First National was entered on October 18, 1979, from which First Fed appeals.

Patricia Builders, Inc. (Patricia), entered into four home improvement contracts in 1975 with Eli T. and Digna E. Perez, Robert A. and Marlene Humphrey, Gerald P. Gaffey, and Charles and Bonnie D. Cole (the homeowners), all of Kenosha county. All of these contracts were executed in Kenosha county at the respective homes where the improvements were to be done. At the same time the homeowners signed their contracts, they executed notes payable to First Fed and second mortgages with First Fed as mortgagee. The mortgages were all notarized by Patricia Miller as if they were executed in Lake county, Illinois. However, none of the homeowners were in Lake county, Illinois at the time of notarizing the mortgages nor was Patricia Miller present when the mortgages were signed by the homeowners. Payments on the notes were to be triggered by completion of the work under the home improvement contracts.

Patricia did some work on the various properties, but never completed the work on any of them. On the following dates First Fed gave Solomon Miller (Miller) (the contractor who operated under the name of Patricia Builders, Inc.) the following checks as payments on the home improvement contracts:

---

[1] Sec. 403.406, Stats., U.C.C. §3–406:

Any person who by his negligence substantially contributes to . . . the making of an unauthorized signature is precluded from asserting the . . . lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

| Check No. | Date | Payable To | Amount |
|---|---|---|---|
| 22101 | Aug. 26, 1975 | Eli T. Perez and Digna E .Perez and Patricia Builders | $ 5,000.00 |
| 22526 | Sept. 18, 1975 | Robert A. Humphrey and Marlene Humphrey and Patricia Builders | 9,000.00 |
| 23137 | Oct. 14, 1975 | Gerald P. Gaffey and Patricia Builders | 6,800.00 |
| 24047 | Dec. 2, 1975 | Charles M. Cole and Bonnie D. Cole and Patricia Builders of Wis., Inc. | 5,000.00 |
| 24046 | Dec. 2, 1975 | Charles M. Cole and Bonnie D. Cole and Patricia Builders of Wis., Inc. | 5,000.00 |
| | | Total | $30,800.00. |

Miller deposited all the checks in Patricia's account at First National. The homeowners' endorsements on all the checks were forged. First National did not ask Miller about the genuineness of the endorsements at the time the checks were deposited. The checks were forwarded to First Fed's bank in Milwaukee county, Wisconsin (the Milwaukee Western Bank) which, in due course, forwarded the amount of the checks to First National for deposit in the Patricia checking account.

After issuing the checks to Miller, First Fed immediately forwarded payment books to the homeowners according to the terms of their respective notes and mortgages. Some of the homeowners made payments to First

Fed on their respective loans even though little or no work was done under the contract. Some payments on the loan of a particular homeowner, Perez, were made by Miller. The total of all of the payments was approximately $2,500.

The homeowners contacted First Fed at various times to discuss problems with the loans and the work on their homes. In March of 1976, Perez, after many complaints to First Fed about Patricia's work on the contract, went to First Fed in Milwaukee. He was allowed to look at the check concerning his loan and immediately informed First Fed that he had not received or endorsed it. Robert Humphrey contacted First Fed on two or three occasions and advised them in November, 1975, that he had not received any loan proceeds. Gerald Gaffey, in late November, 1975, after receiving his loan payment book, contacted First Fed and advised them he had received no loan proceeds and would not pay. Cole, through his lawyer, also contacted First Fed after materialmen's bills were forwarded to him for undelivered materials.

All homeowners at one time or another contacted, or were contacted by, First Fed about their problems with Patricia's performance under the contract, the note and the mortgage. Although First Fed had no record of these contacts, it admitted on trial through its witness, James P. Foley (Foley), first vice president and manager of the installment loan department, that there were such contacts. All contacts were made after deposit of the checks in issue at First National and payment in due course from First Fed's account at Milwaukee Western Bank. Foley further testified that First Fed's knowledge of the problems with Patricia concerning the notes and mortgages came from an article that appeared in The Kenosha News on June 6, 1976.

At various times in September, 1976, First Fed obtained affidavits of forged endorsements of the loan

checks from the four homeowners. First Fed contacted its indemnification bond company, Fidelity, and settled their losses on the forged checks with Fidelity for $23,229.98.

On September 19, 1977, First Fed and Fidelity sued First National for the settlement amount on the theory that it was negligent in failing to follow reasonable commercial standards and that it failed to take reasonable steps available to it to ascertain the genuineness of the endorsements on the checks. First Fed also claims that First National breached its warranty of good title.[2] In its answer First National denied that it was negligent and affirmatively alleged that it followed reasonable commercial standards in its handling of the checks. First National's answer asserts as its affirmative defense that First Fed was negligent in several respects and that as a result of such negligence it is estopped from asserting its claim against First National.[3] Under the estoppel doctrine of the Uniform Commercial Code every person who, by his negligence, substantially contributes to the making of an unauthorized signature, is precluded from asserting the lack of authority against a holder in due course, a drawee, or other payor who pays the instrument in good faith and in accordance with reasonable commercial standards.[4]

The trial court rendered the following findings of fact concerning First Fed's negligent conduct in the matter:

The record further shows First Federal should be found negligent in having contributed substantially to the making of the unauthorized signatures on the checks. In this regard, the record shows the notes and mortgages

[2] Sec. 404.207, Stats., U.C.C. §4–207.
[3] Sec. 403.406, Stats., U.C.C. §3–406.
[4] Id.

in question were executed outside the presence of any of First Federal's employees. First Federal at no time had any personal contact with the borrowing parties. Therefore, they had not taken the precaution of insuring the authenticity of the note and mortgage, or even verifying the fact that they were the individuals whose names appeared on the notes and mortgages, and whom they named as one of the payees on the checks.

First Federal then made delivery of the checks in question directly to Patricia Builders when such delivery of loan proceed checks should go to the borrowing parties unless they are aware of a specific agreement to the contrary and have knowledge of the payee's consent.

As pointed out by Mr. Belmont of the Kenosha National Bank in his testimony, such a check could be delivered to a contractor, but if, and only if, the borrowing parties had expressly authorized the bank to do so; and, in addition, only if the borrowing parties had endorsed the checks in the bank's presence over to the contractors.

Therefore, the preparation of loan documents outside of the lender's presence, the failure to verify with the customer or borrower important information, delivery of checks to someone other than the contracted with payee, a check delivery method without adequate safeguards, failure to make inquiries after notice of some irregularity, and inadequate safeguards in loan processing are all elements to be considered in finding negligence on the part of First Federal Savings & Loan Association.

The trial court concluded that under the estoppel doctrine First Fed and Fidelity are foreclosed from recovery against First National for the five forged checks. First Fed appeals from that judgment.

The issues on this appeal are: (1) whether First National, as a depositary bank,[5] is a party entitled to assert the estoppel defense; (2) whether First National acted in a commercially reasonable manner in accepting checks with forged endorsements without taking steps to assure the validity of such endorsements; and (3) whether First

[5] Sec. 404.105(1), Stats., U.C.C. §4-105(a).

Fed's conduct was negligence which substantially contributed to the forged endorsements.

The Uniform Commercial Code does not specifically resolve the question of whether a drawer can directly sue a depositary or other collecting bank for accepting a check with a forged endorsement. However, the code has been construed to allow such a direct action.[6] This gives rise to the question of whether a depositary bank, sued directly by the drawer for accepting a check with a forged endorsement, is entitled to raise the estoppel defense to preclude recovery against it. First Fed argues that the defense is available to First National only if First National is a holder in due course. The estoppel section does not limit its protection to holders in due course but also extends to "a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commerical standards of the drawee's or payor's business."[7]

First National qualifies as an "other payor" for purposes of sec. 403.406, Stats. Although only the drawee "pays" for purposes of some sections under the code,[8] a broader construction should be given the term "payor" in this section. Comment 6 to U.C.C. §3–406 (identical to sec. 403.406, Stats.) states that the section may be used by a "bank which *takes or pays*[9] a forged check." Com-

---

[6] *Allied Concord Fin. Corp. v. Bank of America*, 275 Cal. App. 2d 1, 5–7, 80 Cal. Rptr. 622, 625–26 (1969); *Prudential Ins. Co. v. Marine Nat'l. Exchange Bank*, 315 F. Supp. 520, 522 (E.D. Wis. 1970).

[7] Sec. 403.406, Stats., U.C.C. §3–406.

[8] Sec. 404.105(2), Stats., U.C.C. Bank Deposits and Collections §4–105(b).

[9] Official Comment 6 provides: The section protects parties who act not only in good faith (Section 1–201) but also in observance of the reasonable standards of their business. Thus any bank which

ment 2 of the section states that a "payor" is one "who may not technically be [a drawee]."[10] The comments indicate that parties other than drawees and holders in due course were meant to be protected by the section and that it is meant to include any bank that "takes" a forged check, provided it acted in a commercially reasonable manner in doing so.[11] This conclusion is further supported by the fact that the 1950 draft of sec. 3–406 of the code referred only to holders in due course and drawees.[12] Then in the 1952 draft, the words "or other payor" were added to the section.[13] It is reasonable to conclude that the addition was intended to broaden the class of persons who could assert the defense.[14] Hence, First National's status as a depositary bank will not, in itself, prevent it from asserting the estoppel defense.

█

The next issue to be resolved in determining whether First National can assert the estoppel defense is whether it acted in a commercially reasonable manner in accepting the checks bearing forged endorsements.[15] First Fed cites, as authority for its claim that First National was negligent, the recent Wisconsin case of *Winkie, Inc. v. Heritage Bank of Whitefish Bay*.[16] That case indi-

---

takes or pays an altered check which ordinary banking standards would require it to refuse cannot take advantage of the estoppel.

[10] Official Comment 2 to U.C.C. §3–406.

[11] Official Comment 6 to U.C.C. §3–406.

[12] U.C.C. §3–406 (1950 version).

[13] U.C.C. §3–406 (1952 version).

[14] The court in *Allied, supra* note 6, ignored the "other payor" language and determined that a collecting bank in a direct suit by a drawer stepped into the shoes of the drawee and could assert the defenses the drawee could assert. That is a more indirect route to the same result we reach here.

[15] Sec. 403.406, Stats., provides that the estoppel defense is available to certain parties who "pay[ ] the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business." There is no contention that First National did not act in good faith.

[16] 92 Wis.2d 784, 285 N.W.2d 899 (Ct. App. 1979).

cated that a drawee collecting bank *can be* negligent in failing to check the authenticity of endorsements on its customers' checks.[17] That case can easily be reconciled with the result reached here. In *Winkie,* an employee of the bank's customer obtained payment on several hundred checks by forging both the drawer's (the bank customer's) signature and the endorsements. The court's "assumption" that the bank's repeated failure to detect the forgeries was negligent is certainly reasonable in light of those particular facts. In the case before us, Miller was First National's customer and was a copayee on the checks bearing the forged endorsements of the other payees. There was no reason for First National to suspect anything was wrong with the endorsement. To require a financial institution to make individual authenticity inquiries on all endorsements would result in absurd expenses. The trial court properly concluded that First National acted in a commercially reasonable manner.

Having determined that the estoppel defense is available to First National, the final question is whether the drawer, First Fed, acted with the requisite negligence to be precluded from recovery under the estoppel doctrine. A trial court's findings will not be upset on appeal unless they are against the great weight and clear preponderance of the evidence.[18] The evidence supporting the trial court's determination of facts need not itself constitute the great weight and clear preponderance and reversal is not required simply because there is evidence supporting a contrary finding. For reversal, evidence

---

[17] The court in *Winkie, id.* at 791, 285 N.W.2d at 902, did not in fact rule that the bank was negligent in failing to examine for proper endorsements but merely "assume[d] for the purposes of [the] case that systematic failure to examine checks in amounts under $1000 for proper endorsements" constituted negligence.

[18] *First Nat'l. Bank of Appleton v. Nennig,* 92 Wis.2d 518, 529, 285 N.W.2d 614, 620 (1979).

supporting a contrary finding must itself constitute the great weight and clear preponderance of the evidence. Where the trial court is the finder of fact and there is conflicting evidence, the trial court is the ultimate arbiter of the credibility of witnesses.[19]

The trial court found that First Fed was negligent in delivering the homeowners' loan checks to Miller, a co-payee of the checks. First Fed argues that a drawer's delivery of checks to a copayee is not negligence.[20]

First National's vice president in charge of home improvement loans, along with a vice president in charge of home improvement loans of another Kenosha bank, testified that the delivery of payment checks to the contractor, without any notice to the customer, is not good banking practice and is commercially unreasonable. They testified that checks made payable to contractors and customers on home improvement loans should be given to the loan customer. However, if delivery of the payout is made directly to the contractor, the loan customer should have previously endorsed the checks in the presence of the bank and authorized the bank to forward the checks to the contractor. The trial court determined that the failure to follow either of these procedures, together with other actions with respect to the loan application and processing, was commercially unreasonable conduct. Whether a party's conduct was negligence which substantially contributed to a forged endorsement is to be determined by the trier of fact.[21]

---

[19] *Id.*

[20] *Gillespie v. Riley Mngm't Corp.*, 13 Ill. App.3d 988, 992, 301 N.E.2d 506, 509 (1973); *Muzzy v. Rockingham County Trust Co.*, 113 N.H. 520, 524, 309 A.2d 893, 895 (1973).

[21] Official Comment 7 to U.C.C. §3-406; *Seattle First Nat'l Bank v. Pacific Nat'l. Bank of Washington*, 22 Wash. App. 46, 58, 587 P.2d 617, 625 (1978).

The trial court's findings of First Fed's negligence contributing to the unauthorized endorsements is certainly not against the great weight and clear preponderance of the evidence. In fact, there is an extreme paucity of contrary evidence. We emphatically endorse the trial court's findings of fact. First Fed's handling of its customers' loans and the payouts of these proceeds was slipshod, at best, and came nowhere near representing commercial reasonableness.

First Fed argues that in determining the reasonableness of its conduct the trial court wrongfully relied on testimony regarding the trade practice in Kenosha county rather than the practice in Milwaukee county, where First Fed is located. However, the record does not disclose a trade practice different in Milwaukee county from that of Kenosha county. The only evidence justifying First Fed's loan procedure in this case is Foley's testimony that the loans were made through Patricia for the "convenience" of the Kenosha homeowners. Further, in this day of both federal and state government control of banks and savings and loans it is hard to imagine that there would be different trade practices in counties of the same state separated by only 25 to 30 miles.

*By the Court.*—Judgment affirmed.