COURT OF APPEALS
DECISION
DATED AND FILED

April 16, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1660**

Cir. Ct. No. **2018CV88**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

---

AARON CARMODY,

    PLAINTIFF-CO-APPELLANT,

  V.

BYLINE BANK,

    DEFENDANT-THIRD-PARTY
    PLAINTIFF-RESPONDENT,

DYLAN ESTERLING,

    DEFENDANT-RESPONDENT,

  V.

NICOLE ELIZABETH CARMODY,

    THIRD-PARTY DEFENDANT-APPELLANT.

---

      APPEAL from an order of the circuit court for Door County: DAVID L. WEBER, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Aaron Carmody and Nicole Elizabeth Carmody,[1] both pro se, appeal from the circuit court's order, entered after a bench trial, dismissing Aaron's claims and Nicole's third-party counterclaims against Byline Bank and Dylan Esterling[2] and granting or dismissing as moot Byline's counterclaims and third-party claims against Aaron and Nicole, respectively.   The Carmodys also challenge the court's decision on the parties' cross-motions for summary judgment, which denied Aaron's and Nicole's motions in their entirety and granted in part Byline's motions as to Nicole's third-party counterclaims and several of Aaron's claims.   The Carmodys' main contention is that Aaron did not sign loan documents with Byline, including mortgages on two parcels of real property, used to obtain a $2,255,000 loan from Byline to purchase a commercial business.   For the reasons that follow, we reject the Carmodys' arguments and affirm.

---

[1] Because these individuals share the same surname, we refer to them using their respective first names.  Additionally, although Aaron is the plaintiff and Nicole is the third-party defendant, they have filed a joint appeal in this case.  Therefore, when addressing the arguments on appeal, we will refer to them as the Carmodys.

[2] Byline is an Illinois banking corporation and is the successor-by-merger of Ridgestone Bank.  Esterling was, at all relevant times, an employee of Ridgestone/Byline.  For ease of reading, we will collectively refer to the defendants in this case as Byline unless we are referring to Esterling's conduct individually.

## BACKGROUND

¶2      In 2015, Aaron and his friends, Adam Komoroski and Nathan Price, (collectively, the Partners) submitted a letter of intent to DAB Drilling, Inc. and CJs Construction & Seeding, Inc. (hereinafter, DAB) to purchase its business located in Commerce City, Colorado, for $3,500,000. The Partners then began communicating with Esterling, the then-Vice President of Business Development for Byline in Appleton, Wisconsin, to obtain a loan through the 7(a) Loan Program of the United States Small Business Administration (SBA). Byline eventually approved a loan to the Partners for $2,255,000, secured by DAB's business assets as well as mortgages against two of the Carmodys' real properties. During negotiations, Byline made clear that the loan was conditioned on the Partners' personal guarantees of the loan and the Carmodys' securing the loan by granting mortgages on their properties.

¶3      On February 18, 2016, Byline issued a commitment letter to the Partners, which summarized the terms and conditions for the expected loan. The commitment letter appeared to be signed by the Partners, and the Partners returned it to Byline along with checks for payment of a refundable deposit.[3] Thereafter, Byline's closing agent[4] worked to obtain the necessary documentation and

---

[3] The record includes a copy of a check for $2,375 issued to Ridgestone and signed by Nicole.

[4] Rissa Angeloni is a commercial lending assistant at Anastasi Jellum, P.A., the attorneys for Byline. For ease of reading, we refer to her as the closing agent.

3

information to close on the loan pursuant to the SBA and Byline's underwriting requirements.[5]

¶4     During this time, according to the record, numerous emails were exchanged between the Partners and Byline.  Aaron responded to some of the emails.  At trial, however, Aaron testified that "there [were] emails that were forwarded to me from [Price].  But I never received any direct communication from Byline.  I never got, for instance, a phone call.  No one wrote me specifically an email.  Everything, I think, was forwarded from [Price] or from [Komoroski] or something."

¶5     By July 2016, the Partners began pressuring Esterling about closing on the loan quickly because they were anxious to purchase DAB.  For example, Price told Esterling on July 18: "If we wait till Thursday vs closing today, we will lose $190,000 in revenue.  We lose $46,000 each day we put off the closing.  We also lose a day in free insurance coverage each day we delay."  On July 20, Byline's closing agent sent an email to Komoroski and Esterling explaining that the loan documents[6] required by Byline would need to be signed "in front of a

---

[5] For example, Byline obtained appraisals on the Carmodys' properties, as noted in the commitment letter.  The appraisals included interior access to the properties, which presumably either Aaron or Nicole provided.

Further, as required by the SBA, Byline obtained a valuation report on DAB prepared by Greener Equity (hereinafter, business valuation), which stated the fair market value of DAB was $5,005,085.  Esterling sent an email to Price and Komoroski, which was later forwarded to Aaron, stating that the business valuation "came back at just over $5 million."  However, the business valuation report was never requested by or shared with the Partners.

[6] We use "loan documents" throughout to refer collectively to, among other things, the note; the loan agreements; the security agreement, granting Byline a security interest in DAB's equipment, fixtures, inventory, accounts, instruments, chattel paper, documents, deposit accounts, vehicles, and general intangibles; an unconditional limited guarantee; mortgages on the Carmodys' properties; an equipment certification; and a personal financial certification for Aaron and Nicole.

notary" and that "[t]entative closing for you has been set in the Brookfield office this Friday." Komoroski forwarded that email to Aaron and Price, and Aaron responded:

> Guys. We will screw this up if not on same page. I thought closing was set for Thursday. I won[']t be able to sign anything on [F]riday. Nicole is only available to sign stuff today. And we only have about 2 hours to get that done. What is she needing to sign? I thought we were going down on [T]hursday?

It appears that Komoroski then called the closing agent to inquire if Nicole's documents could be sent earlier because the closing agent responded to the Partners and Esterling by email that she "spoke with [Komoroski] a little while ago" and explained that "[s]ince Nicole is a limited guarantor on the loan, due to the mortgages, her documents cannot be sent out without" getting the "clear to close" from Byline. Pursuant to the record, Aaron did not further question why Nicole would need to sign for the mortgages.

¶6 Then, on July 21, 2016, the closing agent sent an update that "[a]t this point, we have to move the closing to Monday since … the bank requires the clear to close to be given at least 24 hours before closing." Komoroski replied in an email stating that "Aaron … was pretty upset. It is his wish[] that if it's Monday[,] it needs to be first thing in the morning at [8:00] as he's getting pretty impatient." That email was also sent to Aaron, Price, and Esterling. About an hour later, Price responded,

> We need to try and stick with a tomorrow closing if at all possible. I understand the bank has a 24 hour policy, but this is special circumstance and everyone has had a lot of time to work thru things. The lawyers, buyers and sellers have rearranged their[] schedules several times throughout this week in anticipation for a closing and it's getting harder and harder to stay fluid. [Komoroski] is set to go to Colorado sometime Saturday. He has already set up appointments with customers, vendors and professionals

in the drilling industry. It will not look well if the "new guy" from DAB Drilling is having to reschedule many of these appointments.

[Esterling], is there anyway we could try and push this thru and stick with the plan[?] We would consider signatures on Saturday morning [(July 23)] if need be. Monday is the beginning of a new cycle. We feel it's important to be the owners at the start of this cycle. Please advise.

¶7 According to Esterling's testimony at trial, in an effort to accommodate the Partners' desire to close on the loan by Monday, July 25, 2016, Esterling obtained the loan documents in the morning on Friday, July 22. Esterling explained that the loan documents required notarized signatures "for pretty much all of the documents," which, he noted, was "not typical" but was necessary because it was "a remote closing" that was not occurring at a Byline location. Esterling met Komoroski at a gas station halfway between their respective locations. There, they exchanged the loan documents, and Esterling confirmed that Komoroski "was tasked with taking the documents and circulating them [to the necessary parties], having all the respective parties sign, [and] get[ting] them notarized."

¶8 According to Price's testimony at trial, Komoroski brought the loan documents to the Carmodys' home where Nicole, Price, and Komoroski signed them. Price then left, leaving Komoroski and Nicole with the loan documents. Aaron was not home at the time, but the record suggests that he planned to return that evening.

¶9 The following morning, Komoroski informed Esterling that he had the loan documents and wished to return them. According to Esterling's testimony, after the exchange and upon review of the loan documents, he realized that "all the signature blocks were completed"—including Aaron's signatures—

"but it looked like nothing had been notarized." Knowing that Komoroski was leaving for Colorado that day and knowing how insistent the Partners were about avoiding any delays in closing on the loan, Esterling decided to notarize the loan documents, despite the fact that it is undisputed that Esterling did not witness any of the signatures. That same day, Esterling sent an email to the Partners that said, "Thanks for taking time to go through all of those documents. Everything looked good to me but I have sent everything to [Byline's closing agent] for her review." Esterling testified that Aaron did not respond to this email or Esterling's subsequent email—sent four days later, stating that he had Aaron's signature on a different document—to "allege that he never received any documents[.]"

¶10 The Partners received the funds from the loan to purchase DAB by July 27, 2016. Additionally, funds for working capital were also available to the Partners through the loan, and Komoroski sent an email to Esterling on July 28, requesting that $250,000 be wired to the Partners. Aaron was copied on that email, but he did not respond to question why the funds had been distributed without his signature.

¶11 Almost a year later, in June 2017, Aaron and Price contacted Byline regarding a dispute with the sellers of DAB over equipment that was to be included in the acquisition. Byline provided them with a copy of the equipment certification, which had been signed by Aaron twice—both personally and as the president of DAB—on July 25, 2016, and notarized by Esterling. According to Aaron's testimony, he did not "respond … immediately" to argue that he did not sign that document, but he did have "a discussion with [Price] about this document," during which Aaron claimed he asked Price, "How the hell is my signature on there?" Aaron testified that he "made the conscious decision not to advise [Byline] of [his] accusation of fraud at [that] time."

7

¶12     Concurrently, Aaron and Price continued to discuss the alleged discrepancies in the signed loan documents.  The record includes text messages sent between Aaron and Price in June 2017.  In those texts, Aaron asked why Byline had "all [his] collateral," and Price responded that he did not know and stated that he had asked Esterling that question because he did not "remember [Esterling] being at [Aaron's] house" to notarize the documents.  Aaron agreed, stating, "And yeah *I don't remember signing in front of a notary*.  I'll ask Nicole what she remembers."  (Emphasis added.)

¶13     According to the record, Aaron also communicated with Byline during this period in an effort to release one or both mortgages on his properties.  Aaron sent several emails to Byline discussing the mortgage release, but at no point during these interactions does the record suggest that Aaron informed Byline that he did not sign the loan documents.  In October 2017, Byline approved the release of the mortgage on one of Aaron's properties in exchange for a collateral swap.

¶14     In November 2017, the monthly payment on the Byline loan was not paid due to insufficient funds in DAB's account.[7]  Approximately one month later, on December 11, 2017, Aaron sent a letter to Byline "to inquire of a set of events/facts that I don't quite understand."  In the letter, Aaron stated:

> I can say with 100% certainty [that] I never signed or reviewed any of the [loan] documents pre June 19, 2017[,] and just as certain that I never signed any of these loan documents in front of any notary, and certainly never in front of Dylan Ester[l]ing otherwise in regards to the loan documentation.

---

[7] Monthly payments then continued until May 2018, when—apart from a late payment on June 28, 2018—the payments stopped entirely.

Aaron further asserted that he was away on business the day that the loan documents were signed, and he included with the letter an affidavit from Aaron's client that she had been with Aaron in Marinette, Wisconsin, that day. Finally, he noted that he had hired a forensic document examiner "to validate that the signatures were not mine," and he attached her report of findings to the letter.

¶15    In May 2018, Aaron commenced his lawsuit against Byline. Aaron claimed that he had not signed the loan documents, that his signatures were "forged," and that Esterling had notarized the documents without witnessing any signatures. Aaron also alleged that he had planned to invest $320,000 personally toward the loan to purchase DAB, but he claimed that the Partners had "specifically rejected an offer, by Byline, that their personal homes were to be held as collateral against the loan."

¶16    Aaron's original twenty-count complaint was later amended to fifteen counts, which included the following claims: (1) breach of the implied duty of good faith; (2) conspiracy to convert property; (3) intentional misrepresentation; (4) violation of ordinary care due to a customer; (5) property damage caused by crime pursuant to WIS. STAT. § 895.446 (2021-22);[8] (6) a violation of WIS. STAT. § 100.18; (7) slander of title under WIS. STAT. § 706.13(1); (8) misconduct of a notary public in violation of WIS. STAT. § 137.01(8) (2015-16);[9] (9) a violation of WIS. STAT. § 706.06 for a failure to properly

---

[8] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[9] All references to WIS. STAT. § 137.01(8) are to the 2015-16 version, which was in effect during the time period relevant to this appeal. Section 137.01(8) was renumbered as WIS. STAT. § 140.02(8) in 2020, but its text remains unchanged. *See* 2019 Wis. Act 125, § 20.

authenticate; (10) a violation of WIS. STAT. § 224.77 relating to "[p]rohibited acts and practices, and discipline, of mortgage bankers, mortgage loan originators, mortgage brokers, and registered entities"; (11) a violation of the statute of frauds under WIS. STAT. § 706.02; (12) a violation of WIS. STAT. § 706.05 related to the requisites for recording instruments with a register of deeds; (13) declaratory relief seeking a determination that Byline had no interest in his real property; (14) a claim to quiet title under WIS. STAT. § 841.01; and (15) negligent infliction of emotional distress.

¶17     In March 2019, Byline filed counterclaims against Aaron and a third-party complaint against Nicole.  Byline asserted counterclaims against Aaron for enforcement of the loan documents, a declaratory judgment that the loan documents were valid and enforceable, a "determination" that Aaron had ratified his signatures on the loan documents, equitable estoppel, unjust enrichment, fraud, and misrepresentation.  Byline's third-party complaint against Nicole sought a "determination" that Aaron had ratified his signatures, and it also asserted claims for fraud, misrepresentation, and enforcement of the loan documents.  The complaint also alleged that Nicole "placed the signature of 'Aaron Carmody' … upon the respective [l]oan [d]ocuments" and that Aaron "provided Nicole Carmody with authority to place the signature of 'Aaron Carmody' … upon the respective [l]oan [d]ocuments."

¶18     Byline had, by this time, hired its own forensic document examiner (hereinafter, Byline's expert) who opined, after reviewing numerous documents containing known signatures of Aaron—including endorsed checks, other documents with questioned signatures, and the loan documents—that she was not convinced that Aaron signed the documents.  She further opined that if Aaron was not responsible for signing his name on the loan documents, then the questioned

signatures on the other documents were made by one writer and that was the same person who signed the loan documents, which Byline extrapolated to be Nicole.

¶19  Thereafter, in May 2019, Nicole filed third-party counterclaims against Byline for intentional misrepresentation, intentional interference with contractual relations, a violation of WIS. STAT. § 100.18, slander of title, and a violation of WIS. STAT. § 224.77.  The parties eventually filed cross-motions for summary judgment.  Aaron moved for summary judgment on six of his fifteen counts.  Nicole originally moved to dismiss Byline's third-party complaint, but she later converted her motion to one for summary judgment.  Byline moved for summary judgment on all of Aaron's claims against Byline and all of its claims against Aaron.  It also sought summary judgment on Nicole's third-party counterclaims.  In opposition to Byline's summary judgment motions, Aaron argued for the first time that his intentional misrepresentation claim was based on the theory that Esterling made an intentional misstatement as to the business valuation.

¶20  The circuit court denied Aaron's and Nicole's motions for summary judgment in their entirety but granted Byline's motions in part.  As relevant for this decision, the court determined that neither Aaron nor Nicole had presented admissible evidence of monetary damages based on any cause of action,[10] and the court otherwise narrowed the issues at trial "to a determination whether [Aaron] is liable to Byline, pursuant to the terms of the [l]oan [d]ocuments and/or at law" and

---

[10] The circuit court did order that if Aaron "prove[d], by a preponderance of the evidence, that Byline and/or Esterling acted with malicious and fraudulent intent with respect to the signing of 'Aaron Carmody' on the [l]oan [d]ocuments, the notarization of [Aaron's] signature on the [m]ortgages, and Byline's recording of the [m]ortgages, [Aaron] may pursue an award of reasonable attorneys' fees actually incurred by [Aaron]."

"whether the [mortgages] are enforceable against the [p]roperties owned by" Aaron and Nicole.

¶21 During this time, Byline also moved to exclude Aaron's expert witness testimony. According to Byline's motion, Aaron had sought to call ten expert witnesses after "[t]he deadline to disclose expert witnesses and produce expert reports ha[d] long expired," and he "failed to produce any expert report." One of those experts was Tyler Hinckley, whom Aaron hired to prepare a retrospective business valuation (hereinafter, the Hinckley valuation).[11] The circuit court granted Byline's motion.

¶22 After a twelve-day bench trial, beginning in October 2021 and concluding in January 2022, the circuit court found that "[t]he evidence is virtually certain that [Aaron] affixed his signatures on the [l]oan [d]ocuments," including the note and the mortgages. Therefore, the court concluded that the loan documents were valid and enforceable against Aaron, and it dismissed Aaron's claims against Byline, granted or dismissed as moot Byline's counterclaims against Aaron, granted or dismissed as moot Byline's third-party claims against Nicole, and dismissed Nicole's third-party counterclaims against Byline. The Carmodys appeal.

---

[11] Prior to trial, Byline also filed motions in limine seeking to exclude expected evidence and testimony, including "testimony related to the business valuation obtained by Byline associated with the SBA loan at issue" and the Hinckley valuation. The circuit court conditionally granted all but one of the motions in limine, subject only to Aaron's potential use of the evidence for another purpose.

## DISCUSSION

¶23  On appeal, the Carmodys mainly challenge the circuit court's finding that Aaron signed the loan documents personally, arguing that the court did so "in spite of the great weight of the evidence to the contrary." In addition, they challenge the court's grant of partial summary judgment on several issues. On all these issues, however, we affirm the circuit court.

*I. Aaron's Signature on the Loan Documents*

¶24  The Carmodys first argue that the circuit court's finding that the signature on the loan documents was Aaron's authentic signature was clearly erroneous. Following a bench trial, we will not set aside the circuit court's factual findings unless they are clearly erroneous. WIS. STAT. § 805.17(2). "[A] finding of fact is clearly erroneous when 'it is against the great weight and clear preponderance of the evidence.'" *Phelps v. Physicians Ins. Co.*, 2009 WI 74, ¶39, 319 Wis. 2d 1, 768 N.W.2d 615 (citation omitted). The circuit court is the ultimate arbiter of witness credibility, and when more than one reasonable inference can be drawn from the credible evidence, we must accept the inference drawn by the circuit court. *Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 249-50, 274 N.W.2d 647 (1979). We will not set aside a fact found by the circuit court unless, after accepting all credibility determinations made and reasonable inferences drawn by the court, the great weight and clear preponderance of the evidence supports a contrary finding. *Noll v. Dimiceli's, Inc.*, 115 Wis. 2d 641, 643-44, 340 N.W.2d 575 (Ct. App. 1983).

¶25  The circuit court's finding that "Aaron Carmody did sign the relevant documents" was not clearly erroneous. The court based this finding on several items of evidence. First, the court observed that Aaron "admitted to

signing the documents in" a text message. As noted above, Aaron responded to Price via text message: "I don't remember signing in front of a notary." This evidence, the court explained, was "direct evidence" that he had signed the documents in part because a person "would [not] say that 'I didn't sign in front of a notary' if he didn't sign any documents."

¶26 Next, the circuit court identified "strong circumstantial evidence" in support of its finding. This evidence included the fact that Aaron "never said anything" about not signing the documents necessary to buy DAB "for over a year," including to Price and Komoroski. The court also identified Esterling's email to Aaron on Monday, July 25, 2016, where Esterling stated, "Thanks for taking time to go through all of those documents. Everything looked good to me …." The court questioned why Aaron did not "write back and say, 'What? I never signed any documents. What do you mean everything looks good? When am I supposed to sign?'"

¶27 Further, the circuit court pointed to the fact that Aaron was working in Marinette on the day the documents were signed, but Nicole testified that she "had no discussion about the [loan] documents when [Aaron] got home." According to the court, "[t]here was only one plausible way this could have happened[:] if [Aaron] signed the documents himself. He would not have needed to discuss anything with Nicole as he would have reviewed and signed the documents himself." Also, as it relates to Nicole, the court noted that Nicole's testimony "really persuaded me that Aaron Carmody signed the relevant documents" because she "confirmed that the signatures looked like his" and she described the characteristics of Aaron's different signatures, which "fits the questioned signatures on the documents." Nicole's testimony also revealed to the court that if she had signed Aaron's name, she likely would have signed Aaron's

middle name, Jason, as well, which is not consistent with the signatures on the loan documents.

¶28 Finally, the circuit court found that "it's not plausible to this [c]ourt to believe that … Komoroski would have returned the documents [to Esterling] unsigned." According to the court, when Komoroski told Esterling that he had the documents, that "implied … that they're signed." Based on the above evidence, we cannot conclude that the court's finding that Aaron signed the loan documents was clearly erroneous.

¶29 The Carmodys, nevertheless, disagree that there is a basis for the circuit court's finding. First, the Carmodys argue that "[b]oth experts came to the same conclusion that [the signature on the loan documents] was not Aaron Carmody's authentic signature," regardless of the fact that the court disagreed with both experts. During its oral ruling, the court stated, "I'm not bound by [the experts'] testimony and … under the unique circumstances of this case, … I don't agree with either one of them." The court supported its credibility determination by reasoning that Nicole testified that Aaron's signature "consists of two words with a pen lift and the [other] characteristics Nicole testified to," but the known signatures of Aaron that the experts reviewed "were the one[s] with no pen lift," which was "a major assumption that I find to be erroneous." In other words, the court found both experts not credible due to what it perceived as an error in their analysis.

¶30 The Carmodys claim that this finding "was not logical or proper based on [the circuit court's] reasoning," and they identify Byline's expert's testimony that "Aaron Carmody sometimes uses 2 words for his signature." Citing our supreme court's decision in *Cahill v. Cahill*, 26 Wis. 2d 173, 178-79,

15

131 N.W.2d 842 (1965), the Carmodys also argue that the court could not disregard the experts' testimony because "the credibility of either of the experts was not challenged, none of them were impeached, [and] there was unequivocal testimony without contradiction regarding the authenticity of Aaron Carmody's signature."

¶31     The Carmodys' argument ignores our standard of review. "The weight and credibility to be given to the opinions of expert witnesses is 'uniquely within the province of the fact finder,'" which in this case was the circuit court. *See **Bloomer Hous. Ltd. P'ship v. City of Bloomer***, 2002 WI App 252, ¶12, 257 Wis. 2d 883, 653 N.W.2d 309. Further, as the circuit court recognized, "[t]he trier of fact is not bound by the opinion of an expert; rather, it can accept or reject the expert's opinion." *See **State v. Kienitz***, 227 Wis. 2d 423, 438, 597 N.W.2d 712 (1999). The court "was free … to accept or reject the testimony of any expert, including accepting only parts of an expert's testimony; and to consider all of the non-expert testimony in deciding" an issue. *See **id.*** at 441 (citation omitted).

¶32     Therefore, the circuit court, as the trier of fact, was free to reject the experts' opinions, and the court did not err by disagreeing with both of the experts' conclusions. To the extent that the Carmodys challenge the court's *reason* for disagreeing with the experts, we also see no error. The court provided a clear explanation for the reason it questioned the experts' opinions, stating that the opinions were in conflict with Nicole's testimony, which it found "more compelling." Further, as it pertains to Byline's expert, her testimony was clear that even Aaron's "known signatures" have "a wide variation." Thus, we cannot conclude that the court's finding was contrary to the great weight and clear preponderance of the evidence.

¶33    We also conclude that the Carmodys' reliance on *Cahill* is misplaced. The court in *Cahill* concluded that the circuit court "was not at liberty to disregard" the expert testimony under the specific circumstances of that case. *Cahill*, 26 Wis. 2d at 178-79. The court clarified, however, that it was "not prepared to state that the trier of the fact is absolutely bound by the uncontradicted testimony of an expert." *Id.* at 178. Thus, *Cahill* does not dictate any specific result in this case, and the Carmodys have not explained how the circumstances here mirror the circumstances in *Cahill* such that the court's conclusion in that case would apply here.[12]

¶34    Next, the Carmodys argue that the circuit court erred because Aaron's text message to Price about not signing before a notary "is not in any way recognizable as an admission." They fault the court for failing to acknowledge Price's additional testimony that when Aaron said that he did not "remember signing in front of a notary," Aaron was "being sarcastic, because he already told [Price] he didn't sign these documents."[13] According to the Carmodys, "[t]he language usage interpretation concocted first by the defense and then adopted by the court to turn a negative statement about one fact, does not constitute a positive fact about another, this is just basic language usage." Thus, they claim that there is no conflicting testimony to refute Price's or Aaron's explanation of the text

---

[12] The Carmodys' citations in their reply brief are equally unavailing because there *was* conflicting testimony on this issue at trial. *See Gehr v. City of Sheboygan*, 81 Wis. 2d 117, 122, 260 N.W.2d 30 (1977); *First Nat'l Bank of Appleton v. Nennig*, 92 Wis. 2d 518, 529, 285 N.W.2d 614 (1979); *Milbauer v. Transport Emps.' Mut. Benefit Soc'y*, 56 Wis. 2d 860, 865, 203 N.W.2d 135 (1973).

[13] At trial, however, Aaron testified that he "remember[ed] signing documents [but] not" the document being discussed in the text exchange, and he "just never remembered signing in front of a notary for anything for anyone."

message and that the court's "inference" that Aaron "admitted signing specifically the loan and mortgage documents is not a reasonable one."

¶35 All of the Carmodys' remaining arguments on this issue also pertain to their belief that the circuit court did not properly consider certain items of evidence, which they offer in an attempt to refute the circuit court's findings regarding its interpretation of Price's and Nicole's testimony and Aaron's claim that he was not in town on the date the documents were signed.[14] However, all of

---

[14] In arguing that the circuit court's determination was incorrect, the Carmodys also highlight evidence that Nicole may have signed the loan documents. While Byline did argue at trial that Nicole signed the loan documents for Aaron, the court did not make that finding; therefore, we are unsure why the Carmodys are advancing this argument on appeal. To the extent that the Carmodys intend to make a different argument on this point, we are unable to discern it from their briefing and reject it as undeveloped. *See* ***State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

The Carmodys also assert that Byline was negligent and is "now trying to erase [its] own negligence by blaming Aaron and Nicole Carmody for this litigation." In support of their position, they highlight the circuit court's statement that "[i]f the plaintiff set out to prove that the closing was not handled well, I think the plaintiff succeeded," and they cite ***Fidelity & Deposit Co. v. First National Bank***, 98 Wis. 2d 474, 480-81, 297 N.W.2d 46 (Ct. App. 1980), for the proposition that Byline "should be found negligent in having contributed substantially to the making of the unauthorized signatures." According to the Carmodys, pursuant to WIS. STAT. § 891.25, once Aaron denied that his signature was valid, "the burden of proof shift[ed] to [Byline] who should be precluded under equitable doctrine from asserting the signature is genuine."

First, the Carmodys have not argued how ***Fidelity & Deposit Co.*** has any application to the question in the instant case. There, First Federal Savings & Loan Association and Fidelity & Deposit Company of Maryland sued First National Bank of Kenosha for accepting home improvement loan checks containing forged endorsements. ***Fidelity & Deposit Co.***, 98 Wis. 2d at 476. Thus, this case is, at the very least, factually distinguishable from ***Fidelity & Deposit Co.***, and we conclude that it has no application to the circumstances here.

Further, to the extent that the Carmodys argue that Byline had the burden to prove that Aaron's signature on the loan documents was valid, based on the findings of the circuit court, Byline met that burden, and we have concluded that the court's findings were not clearly erroneous. The Carmodys have not presented any applicable legal authority to suggest that Byline was precluded from arguing that Aaron's signature was valid, when that was the primary issue in this case.

the Carmodys' arguments in this regard merely ask us to reweigh the evidence on appeal. Under our standard of review, we cannot, and will not, do so. We are satisfied, based on our review of the record, that the circuit court's rejection of both the experts' testimony and the Carmodys' evidence was proper. While the Carmodys wish the court had weighed the evidence—especially Aaron's testimony—differently, the record supports the court's finding that Aaron signed the loan documents. Thus, the court's conclusion was not contrary to the great weight and clear preponderance of the evidence.

*II. Damages From Esterling Notarizing the Carmodys' Signatures*

¶36    The Carmodys next argue that the circuit court erred by granting partial summary judgment to Byline on several issues. "Whether summary judgment was appropriately granted presents a question of law which we review pursuant to [WIS. STAT. §] 802.08(2), … independently of the [circuit] court." ***Helland v. Kurtis A. Froedtert Mem'l Lutheran Hosp.***, 229 Wis. 2d 751, 755, 601 N.W.2d 318 (Ct. App. 1999). "That methodology is well known, and we will not repeat it here except to observe that summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." ***M & I First Nat'l Bank v. Episcopal Homes Mgmt.***, 195 Wis. 2d 485, 496-97, 536 N.W.2d 175 (Ct. App. 1995). To defeat a properly supported summary judgment motion, a party must do more than just allege a factual dispute; he or she must present "specific facts" creating a genuine issue for trial. ***Helland***, 229 Wis. 2d at 756 (citation omitted). "It is not enough to rely on unsubstantiated conclusory remarks, speculation, or testimony which is not based upon personal knowledge." ***Id.***

19

¶37     The Carmodys first argue that the circuit court erred by dismissing with prejudice on summary judgment Aaron's claim[15] for damages pursuant to Wis. Stat. § 137.01(8), relating to a notary's misconduct. Section 137.01(8) provided: "If any notary public shall be guilty of any misconduct or neglect of duty in office the notary public shall be liable to the party injured for all the damages thereby sustained." However, the law is clear that damages cannot be recovered from a notary public for the notary's negligence unless the damages were proximately caused by the notary's negligence. *Governor of Wis. ex rel. Kadin v. Bristol*, 229 Wis. 95, 98, 281 N.W. 686 (1938).

¶38     On summary judgment, the circuit court determined that Aaron "failed to present admissible evidence of any damages arising from Esterling notarizing the signatures of 'Aaron Carmody' on the [m]ortgages." Therefore, the court ordered that claim be limited at trial to determining "whether the [m]ortgages constitute valid and enforceable liens against the [p]roperties." The court further stated that damages would be "limited to a potential claim for [Aaron's] actual attorneys' fees, should a [fact finder] determine that Esterling acted with malice with respect to notarizing the signatures." Then, at trial, the court concluded that "there was notarial misconduct here" based on Esterling notarizing the signatures on the loan documents without witnessing them. However, the court also determined that Esterling did not act with malice in notarizing the signatures, that Aaron executed the mortgages, and that Aaron failed to present admissible evidence of any damages arising from the notarization.

---

[15] Nicole did not assert a third-party counterclaim under Wis. Stat. § 137.01(8).

¶39    On appeal, the Carmodys argue that the circuit court erred by "finding that no violation occurred" because "Esterling's conduct is the very reason for the law" and "[t]o condone the behavior of Esterling would be contrary to the law on the matter." According to the Carmodys, Esterling's conduct caused their damages because they were "effectively forced to litigate with another party, Byline, to refute the authenticity of the signatures"; therefore, "Esterling was in violation of various statutes, which entitled [Aaron] to an award of damages."

¶40    While the Carmodys present a very impassioned argument that Esterling is to be blamed for this entire case, we agree with Byline that "[i]rrespective" of whether Esterling committed misconduct or neglect or whether he acted with malice, the Carmodys' "claim still fails because [they] failed to show that [they] suffered any damages" *as a result of* Esterling's notarization. *See **Production Credit Ass'n v. Nowatzski***, 90 Wis. 2d 344, 356-57, 280 N.W.2d 118 (1979) ("The general rule is that damages must be proved with reasonable certainty."). The Carmodys' arguments on appeal are conclusory at best, and they fail entirely to show how the circuit court erred by concluding on summary judgment and at trial that Aaron failed to prove damages. They simply assert that they have proved "at a minimum, damages relating to hiring a forensic document examiner and legal fees to contest the signatures['] authenticity," without citing any evidence in the record.[16]

---

[16] In reply, the Carmodys attempt to develop their argument on this point; however, developing an argument for the first time in a reply brief impermissibly deprives Byline of an opportunity to respond. Therefore, we need not address the Carmodys' reply arguments. *See **Swartwout v. Bilsie***, 100 Wis. 2d 342, 346 n.2, 302 N.W.2d 508 (Ct. App. 1981).

(continued)

21

¶41 To succeed on their notarial negligence claim, the Carmodys were required to "prove by credible evidence to a reasonable certainty that damages were suffered [as a result of Esterling's negligence] and to establish at least to a reasonable probability the amount of these damages." *See Pleasure Time, Inc. v. Kuss*, 78 Wis. 2d 373, 387, 254 N.W.2d 463 (1977); *see also Grand View Windows, Inc. v. Brandt*, 2013 WI App 95, ¶22, 349 Wis. 2d 759, 837 N.W.2d 611 ("We cannot uphold a judgment based on 'conjecture, unproved assumptions, or mere possibilities.'" (citation omitted)). We agree with the circuit court that they have failed to do so. First, the Carmodys failed to identify "credible evidence" in the record before the court on summary judgment to support the amount of their claimed damages. The question here requires the presentation of evidentiary facts *by affidavit or other proof*. *See* WIS. STAT. § 802.08(2). The Carmodys do not identify any such admissible evidence of their alleged damages in the record before this court. Quite simply, the Carmodys failed to support their

---

Nevertheless, we note that the "evidence" the Carmodys assert that they provided to the circuit court, and that the court then "ignored," included: (1) equipment contracts for equipment Aaron allegedly "purchased in order to mitigate damages … to complete work done on standing contracts"; (2) a list of dates and numbers of hours, labeled "Attorneys fees log" without any additional identifying information; and (3) Aaron's response to Byline's motion for summary judgment, where he simply listed his purported damages, including attorneys' fees of $204,325, his personal time—which he appears to have charged at $100 an hour—and the alleged cost of the forensic document examiner. Further, as Byline explains, Aaron created a document titled "Damages Worksheet" where he listed $27,148,100 in damages that he "'supported' by a rambling narrative in his discovery responses." However, as we have repeatedly stated, arguments of counsel are not evidence, *Merco Distrib. Corp. v. O & R Engines, Inc.*, 71 Wis. 2d 792, 795-96, 239 N.W.2d 97 (1976); therefore, Aaron's motions or arguments contained in the motions are not evidence. Further, to the extent that the other examples could be deemed "evidence," we conclude that they are insufficient to prove damages to a reasonable certainty because they lack both foundation and specificity tying the claimed damages to Esterling's actions in this case. *See Pleasure Time, Inc. v. Kuss*, 78 Wis. 2d 373, 387, 254 N.W.2d 463 (1977).

allegations with evidentiary facts by affidavit or other proof sufficient to raise a genuine issue of material fact that should have been tried.

¶42    Second, we conclude that the Carmodys have failed to prove that any alleged damages were proximately caused by Esterling notarizing the loan documents. *See Kadin*, 229 Wis. at 98. A proximate cause is "[a] cause that directly produces an event and without which the event would not have occurred." *Proximate Cause*, BLACK'S LAW DICTIONARY (11th ed. 2019). Based on the circuit court's finding that Aaron signed the loan documents and our affirmation of that finding, any damages the Carmodys allegedly suffered were not caused by Esterling's act of notarizing the loan documents. By signing the loan documents, Aaron received exactly what he bargained for: a loan in the amount of $2,255,000 to purchase DAB conditioned on, among other things, the mortgages on his properties that secured the loan.[17]

---

[17] The Carmodys also appear to argue that they are entitled to the "costs and expenses of litigation" because Esterling's "wrongful acts … have involved [them] in litigation with others, or placed [them] in such relation with others as to make it necessary." *See Talmer Bank & Tr. v. Jacobsen*, 2018 WI App 15, ¶8, 380 Wis. 2d 171, 908 N.W.2d 495 (citation omitted). Given our conclusions above, we do not agree that Esterling's actions involved the Carmodys in litigation with others. Despite signing the relevant documents, the Carmodys chose to commence this litigation in an attempt to void the security they provided as part of their agreement. Therefore, they are not entitled to costs and expenses of litigation.

Without explanation or argument, the Carmodys also cite cases addressing punitive damages. *See Fahrenberg v. Tengel*, 96 Wis. 2d 211, 221, 291 N.W.2d 516 (1980); *Kink v. Combs*, 28 Wis. 2d 65, 79, 135 N.W.2d 789 (1965). We assume, based on the citations, that they are attempting to argue that malice is not necessary for an award of punitive damages. However, their argument is entirely undeveloped, and we will not address it further. *See Pettit*, 171 Wis. 2d at 646.

*III. Intentional Misrepresentation Based on the Business Valuation*

¶43    Next, the Carmodys argue that the circuit court erred by granting partial summary judgment to Byline on their claims[18] for intentional misrepresentation.

> To state a claim for intentional misrepresentation, a complaint must allege that: (1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to his/her detriment.

***Ramsden v. Farm Credit Servs. of N. Cent. Wis. ACA***, 223 Wis. 2d 704, 718-19, 590 N.W.2d 1 (Ct. App. 1998) (footnotes omitted).

¶44    Initially, as noted above, we recognize that Aaron did not assert a claim for intentional misrepresentation *based on the business valuation* in his complaint or amended complaint.  On appeal, Aaron explains that he uncovered "that the financials that went into the creation of it were not correct" "[a]fter [d]iscovery had commenced."  In opposition to summary judgment, Aaron argued that although the business valuation stated that DAB's value was $5,005,085 and "listed physical assets valued at approximately $1.5 [million] and accounts receivable of $1.429 [million]," "Esterling knew that these numbers were

---

[18] Byline argues that Nicole did not assert a claim for intentional misrepresentation *relating to the business valuation*.  In their reply, the Carmodys disagree and claim that because they "are jointly appealing the [circuit] court's decision … her pleadings are equally relevant."  However, we agree with Byline that "[i]t's entirely unclear how Nicole Carmody could have a claim [for intentional misrepresentation based on the business valuation], given that [a] representation was never made to her and, by her own admission, she knew nothing about the SBA [l]oan or [b]usiness [v]aluation prior to this lawsuit."

erroneous as he had been previously shown information that they were not to be part of the sale." Aaron alleged that the Hinckley valuation "puts the value of the business at $2,139,773." According to Aaron, Esterling knew that the information in the business valuation was erroneous, and because Esterling had created a duty by providing the Partners with the business valuation information, he had a duty to provide the information in a "non-negligent manner and with accuracy." Aaron claimed that Esterling made a material misrepresentation by "misrepresenting the equipment list value" and "misrepresenting the value of the business."

¶45 On appeal, Byline first argues that we "should not take up the issue" because "[a]ppellate courts do not address an issue that is raised for the first time on appeal except in rare circumstances." As is obvious based on the above discussion, however, the Carmodys did not raise this issue for the first time on appeal. Aaron raised it before the circuit court, and the court did consider and rule on Aaron's belated allegations. The court concluded that neither Byline nor Esterling "ma[de] false representations or misrepresentations by silence in connection with the [b]usiness [v]aluation" and that Aaron "did not rely upon any representation or omission from Byline and/or Esterling with respect to the [b]usiness [v]aluation, the business assets [of DAB] acquired by [the Partners], or [Aaron's] decision to purchase DAB." The court also recognized that Aaron never saw the business valuation; therefore, there was no evidence that he relied on it. Accordingly, we will address the issue.

¶46 We conclude that the circuit court properly granted partial summary judgment to Byline. On the first two elements of intentional misrepresentation—namely, whether the defendant made a factual representation that was untrue—we conclude that the Carmodys failed to present evidence that either Byline or Esterling made a false representation. On June 24, 2016, Esterling emailed Price

25

and Komoroski (but not Aaron), stating, "I don't have the full report yet but the business valuation came back at just over $5 million." That email was later forwarded to Aaron. The parties have not asserted that there was any other communication regarding the business valuation, aside from a text message between Komoroski and Esterling on June 7, 2016, where Komoroski asked, "Do you feel that eval[uation] will come through OK?" There was no other communication about the business valuation from Esterling, the Partners never requested the business valuation report, and Esterling never provided it to them.

¶47 Esterling's claim in the June 24, 2016 email that the business valuation "came back at just over $5 million" is not incorrect: according to the report that Esterling relied upon in making that statement, DAB's value was $5,005,085. Esterling never represented anything else about the accuracy of the report or even provided the report, such that the provision of the report itself could be considered a representation. Thus, based on the facts, we agree with the circuit court that "Byline and Esterling did not make false representations or misrepresentations by silence in connection with the [b]usiness [v]aluation or the business assets."

¶48 Even if we were to assume that Esterling made a factual representation about the business valuation by simply providing the value, and if we further assumed that the value was incorrect, we conclude that the Carmodys have failed to establish the fifth element of intentional misrepresentation because any reliance by Aaron was not reasonable or justifiable. *See Ritchie v. Clappier*, 109 Wis. 2d 399, 404, 326 N.W.2d 131 (Ct. App. 1982) ("The reliance must be 'justifiable.' Negligent reliance is not justifiable." (citation omitted)). Aaron was obligated to act to protect himself and conduct his own due diligence. *See Production Credit Ass'n v. Croft*, 143 Wis. 2d 746, 760, 423 N.W.2d 544

26

(Ct. App. 1988) (citing *Denison State Bank v. Madeira*, 640 P.2d 1235 (Kan. 1982), for the proposition that "one cannot avoid the responsibility of exercising reasonable diligence for his own protection by relying upon his bank to provide him with information which was not specifically requested and which was otherwise readily available"); *Jacobsen v. Whitely*, 138 Wis. 434, 437, 120 N.W. 285 (1909) ("[C]ourts will refuse to act for the relief of one claiming to have been misled by another's statements who blindly acts in disregard of knowledge of their falsity or with such opportunity that by the exercise of ordinary observation, not necessarily by search, he would have known.").

¶49    It is undisputed that Aaron did not ask for the business valuation despite knowing that it existed prior to the loan closing. Byline obtained the business valuation for the purpose of underwriting the loan, but the Partners negotiated the terms of DAB's sale, including the sale price, prior to Byline's business valuation. Thus, the Partners would have been in the best position to know whether the business valuation was correct or incorrect based on the items included in the valuation. The record suggests that the Partners had this information because the Partners were provided a list of "all the equipment and vehicles" that would be included in the sale, and the record also includes evidence of discussions with the sellers of DAB regarding a collateral shortfall. Thus, we agree with the circuit court that the Carmodys failed to present sufficient evidence that Aaron's alleged reliance on Esterling's statement about the business valuation, without conducting his own due diligence, was reasonable.

¶50    On appeal, the Carmodys argue that they "had a right to rely on the number [of the business valuation] as being accurate as the duty to represent accurate information is on the sophisticated party, not upon the unsophisticated party." "In general, silence or a failure to disclose a fact is not an intentional

misrepresentation unless the person has a duty to disclose." ***John Doe 1 v. Archdiocese of Milwaukee***, 2007 WI 95, ¶48, 303 Wis. 2d 34, 734 N.W.2d 827. "If there is a duty to disclose a fact, failure to disclose that fact is treated in the law as equivalent to a representation of the nonexistence of the fact." ***Ollerman v. O'Rourke Co.***, 94 Wis. 2d 17, 26, 288 N.W.2d 95 (1980).

¶51 The Carmodys claim that Byline had a duty to disclose that the amount of the business valuation was incorrect because "an SBA accredited loan servicer such as Byline has a duty to every taxpayer in the county to represent accurate information in the loan process, [and] to argue otherwise is foolish and contrary concerning public policy." In support of their position, the Carmodys cite ***Ollerman*** and ***Westerfield v. Quizno's Franchise Co. (Westerfield I)***, 527 F. Supp. 2d 840 (E.D. Wis. 2007), *judgment vacated in part by* ***Westerfield v. Quizno's Franchise Co. (Westerfield II)***, No. 06-C-1210, 2008 WL 2512467 (E.D. Wis. Apr. 16, 2008).

¶52 The Carmodys first cite ***Ollerman***—a case involving a motion to dismiss a complaint for failure to state a claim in a dispute between a buyer and a seller of vacant land—for the proposition that "[a] fact is known to the vendor if the vendor has actual knowledge of the fact or if the vendor acted in reckless disregard as to the existence of the fact." ***Ollerman***, 94 Wis. 2d at 20-21, 42. According to the Carmodys, Byline "had knowledge at the time the statement was made that the math that went into the appraisal could not possibly be right … thus the appraisal could not be correct, and [Byline] failed to disclose that fact."

¶53 However, what our supreme court actually stated in ***Ollerman*** was that "[w]here the vendor is in the real estate business and is skilled and knowledgeable and the purchaser is not, the purchaser is in a poor position to

discover a condition which is not readily discernible, and the purchaser may justifiably rely on the knowledge and skill of the vendor." *Id.* at 41. Therefore, the court held "that a subdivider-vendor of a residential lot has a duty to a 'non-commercial' purchaser to disclose facts which are known to the vendor, which are material to the transaction, and which are not readily discernible to the purchaser." *Id.* at 42. A vendor is defined as "[a] seller, usu. of real property." *Vendor*, BLACK'S LAW DICTIONARY (11th ed. 2019).

¶54 Thus, *Ollerman* has no application to this case because Byline was not the seller of any property in this transaction. The transaction was between the Partners and the former owners of DAB and was a commercial transaction; Byline was merely providing the loan for the Partners to purchase DAB. The Partners here were not in a "poor position to discover a condition which is not readily discernible," *see Ollerman*, 94 Wis. 2d at 41, because they could have easily asked for the business valuation and compared it to their knowledge of the terms of the sale to discover any inconsistencies. In other words, this was not a case involving a sophisticated party dealing with an unsophisticated entity. Aaron had the duty and means to independently determine if DAB had the stated value.

¶55 Next, the Carmodys cite *Westerfield I* for the following statement: "Even apart from the *Ollerman* exception, Wisconsin also recognizes the rule that a duty to disclose may arise where a seller has told a half-truth or has made an ambiguous statement if the seller's intent is to create a false impression and he [or she] does so." *Westerfield I*, 527 F. Supp. 2d at 850. Again, Byline was not the *seller* in this transaction, so any duty suggested by the court's decision in *Westerfield I* is inapplicable here. More importantly, however, *Westerfield I* is no longer good law because the district court, on a motion for reconsideration,

29

reversed its decision after concluding that it erred. *Westerfield II*, No. 06-C-1210, at \*2-8.

¶56  Finally, the Carmodys cite *Nischke v. Farmers & Merchants Bank & Trust*, 187 Wis. 2d 96, 113, 522 N.W.2d 542 (Ct. App. 1994), for the proposition that "Wisconsin has long recognized that liability may be imposed on one who, having no duty to act, gratuitously undertakes to act and does so negligently."  However, they fail to develop any further argument than that discussed and refuted above based upon their claim that Byline incurred liability for a "gratuitous" disclosure of the amount of the business valuation.

¶57  In all, Byline did not owe the Carmodys a duty with regard to the business valuation under the circumstances here, and the Carmodys have cited no legal authority to support that assertion.  The Carmodys attempt to shift the blame onto Byline by arguing that because Esterling was aware that "equipment values could trigger the need for a new appraisal," Esterling was required to act. However, the Partners had the same, if not more, information as Esterling and Byline.  In fact, when the topic of the "list of assets" being used "for the sale" was discussed prior to closing, Esterling was very clear that Byline did not "have a very good list to work off of" and that "[i]t [would] really be up to you guys to make sure that the sellers are leaving all of the assets for you."  As Byline argued, it "did not owe [Aaron] a duty to hold his hand throughout a sophisticated commercial transaction, where [Aaron] plainly had access to at least as much information as" Byline.

*IV.  WIS. STAT. § 100.18 Claims*

¶58    The Carmodys next challenge the circuit court's dismissal on summary judgment of their WIS. STAT. § 100.18 claims.[19]  Their arguments on this issue are similar to, and based on the same facts as, the intentional misrepresentation claim addressed above.    Section § 100.18(1) "generally prohibits false, deceptive, or misleading representations or statements of fact in public advertisements or sales announcements."  ***Tietsworth v. Harley-Davidson, Inc.***, 2004 WI 32, ¶38, 270 Wis. 2d 146, 677 N.W.2d 233.  To prove a § 100.18(1) claim, a plaintiff must establish three elements: (1) that the defendant made a representation to the public with the intent to induce an obligation; (2) that the representation was untrue, deceptive, or misleading; and (3) that the representation caused the plaintiff a pecuniary loss.  ***K & S Tool & Die Corp. v. Perfection Mach. Sales, Inc.***, 2007 WI 70, ¶19, 301 Wis. 2d 109, 732 N.W.2d 792.  A statement made to a single person may constitute a statement made to "the public" under § 100.18(1).  ***Kailin v. Armstrong***, 2002 WI App 70, ¶44, 252 Wis. 2d 676, 643 N.W.2d 132.

¶59    The Carmodys have failed to carry their burden to present a dispute as to the material facts or to show that the circuit court erred.  As to the first element of WIS. STAT. § 100.18, the Carmodys claim that the court erred as a matter of law because it found that "no statements were made to the public."  To the contrary, the Carmodys assert that Aaron "was most definitely a member of the public at all times leading up to the [c]losing and after."  *See **Kailin***, 252 Wis. 2d

---

[19] As discussed above, *see supra* note 18, we also question whether Nicole would have a claim under WIS. STAT. § 100.18, given that any alleged representation by Byline or Esterling was never provided to her.

676, ¶44.  Based on our reading of the record, we question whether the court actually dismissed the § 100.18 claim because Aaron was not "the public," but, regardless, we conclude the undisputed facts show that the Carmodys cannot establish the remaining elements of their claim.

¶60     On element two, the Carmodys argue that they presented an issue of material fact because Esterling's statement "that an appraisal for [the] prospective business came back at 5 plus million dollars" was misleading because Esterling "knew that the numbers that went into the appraisal were incorrect."  As we explained above, *see supra* ¶47, Esterling's statement that the business valuation "came back at just over $5 million" was true.  As to the Carmodys' claim that the statement was deceptive or misleading, again, Aaron had as much, if not more, information regarding the business valuation as Esterling and could have asked for the business valuation and questioned the $5 million value.  He failed to do so. Esterling was not representing anything other than the fact that the business valuation "came back at just over $5 million," which was entirely correct.

¶61     On the third element, we conclude that the Carmodys failed to establish a genuine issue of material fact as to whether Byline's alleged misrepresentation caused them to sustain a pecuniary loss.  WISCONSIN STAT. § 100.18 "requires a causal connection between the untrue, deceptive, or misleading representation and the pecuniary loss," which "requires a showing of material inducement."  *K & S Tool & Die Corp.*, 301 Wis. 2d 109, ¶35; *see also* WIS JI—CIVIL 2418 (2021).  We conclude, as a matter of law, that the undisputed evidence established that the business valuation did not influence or induce Aaron to purchase DAB.  The Partners entered into a letter of intent to buy DAB for $3.5 million before the Partners met Esterling and long before the business valuation was prepared.  Further, according to the record, the Partners performed their own

financial analysis of DAB—included within a business plan that the Partners created—and provided this information to Byline.[20]  Therefore, the circuit court did not err by dismissing the Carmodys' § 100.18 claims.

*V.  Breach of the Implied Duty of Good Faith Claim*

¶62     Finally, the Carmodys argue that the circuit court erred by dismissing on summary judgment Aaron's breach of contract claim based on a claimed breach of the implied duty of good faith.[21]  "Every contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties."  ***Beidel v. Sideline Software, Inc.***, 2013 WI 56, ¶27, 348 Wis. 2d 360, 842 N.W.2d 240 (citation omitted).  Thus, at the very least, a claim for a breach of the implied duty of good faith requires that there is a contract between the parties.  Accordingly, the court dismissed this claim on summary judgment because it "directly contradicts [Aaron's] position underlying his statement of the case:  there is no contract between himself and Byline."

¶63     On appeal, the Carmodys argue that the circuit court's dismissal of the claim was "premature and contrary to law" because "[a] genuine issue of material fact existed."  The Carmodys' entire argument on this issue is that because "[t]he court ultimately determined that there was a contract, determining in its decision that a genuine issue of material fact had been resolved," "it was improper to dismiss" Aaron's implied duty of good faith claim.

---

[20] Aaron testified that he had no involvement in creating the plan; however, only *his* contact information appears on the first page of the plan.

[21] Nicole did not assert a counterclaim for breach of the implied contractual duty of good faith.

¶64 We deem this argument undeveloped. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). As Byline argues, Aaron's lawsuit was predicated on the assertion that no contracts existed; thus, the Carmodys have not explained why they would be "entitled to relitigate this issue as though [Aaron] accepted there were contracts all along."

¶65 We acknowledge that Aaron could have argued in the alternative before the circuit court that if there was a valid contract, then Byline failed to comply with its implied duty of good faith; however, he did not do so. Aaron's breach of the implied duty of good faith claim in his amended complaint was based entirely on an alleged violation of the duty of good faith in the context of the negotiation and creation of the mortgage and loan agreements, which contracts he clearly claimed were not valid and binding. However, the contractual duty of good faith only arises from a valid contract. *See VanHierden v. Swelstad*, 2010 WI App 16, ¶11, 323 Wis. 2d 267, 779 N.W.2d 441 ("In a breach of contract case, the plaintiff must establish the existence of the contract."); *Hauer v. Union State Bank of Wautoma*, 192 Wis. 2d 576, 596-97, 532 N.W.2d 456 (Ct. App. 1995) (statute requiring good faith "applies only to the performance or enforcement of a contract, it does not impose a duty of good faith in the negotiation and formation of contracts"). The Carmodys have failed to demonstrate that the circuit court erred.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.